# In the United States Court of Federal Claims

No. 11-54 C
(Filed March 21, 2013)[1]

```
* * * * * * * * * * * * * * * * * * * *
CENTURY EXPLORATION        *
NEW ORLEANS, LLC,          *
                           *
        Plaintiff,         *
                           *       Breach of Oil and Gas Lease;
and                        *       Risk of Regulatory Change;
                           *       Sovereign Acts Doctrine;
CHAMPION EXPLORATION, LLC, *       Outer Continental Shelf Lands Act,
                           *       43 U.S.C. §§ 1331-1356 (2006);
        Third-Party Plaintiff, *   Motion for Summary Judgment,
                           *       RCFC 56.
        v.                 *
                           *
THE UNITED STATES,         *
                           *
        Defendant.         *
* * * * * * * * * * * * * * * * * * * *
```

    *Richard K. Leefe*, Metairie, LA, for plaintiff Century Exploration New Orleans, LLC.  *Michael R. Gelder* and *James K. Sticker, III*, Metairie, LA, of counsel.

    *Guy E. Wall*, New Orleans, LA, for plaintiff Champion Exploration, LLC.

    *Gregg M. Schwind*, United States Department of Justice, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Steven J. Gillingham*, Assistant Director, Washington, DC, for defendant.

---

    [1]  This opinion was issued under seal on March 8, 2013.  Pursuant to ¶ 5 of the ordering language, the parties were invited to identify any proprietary information contained in the sealed opinion and to propose redactions to that opinion.  On March 19, 2013, defendant filed a notice in which it informed the court that the parties had no proposed redactions to the sealed opinion.

_____

**OPINION**

_____

**Bush,** *Judge.*

Now pending before the court are the parties' cross-motions for partial summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), on plaintiffs' breach claim (Count I of the complaint). The motions have been fully briefed and are now ripe for a decision by the court. Because none of the government's actions in this case breached plaintiffs' lease, the government's motion for partial summary judgment is granted, and plaintiffs' cross-motion for partial summary judgment is denied.

## BACKGROUND[2]

### I.    Factual Background

The United States, acting through the Department of the Interior (Interior), is the defendant in this case.  Interior is charged with managing many of the nation's energy resources, including resources located under the submerged lands of the Outer Continental Shelf (OCS)[3] in the Gulf of Mexico and in other waters of the United States.  Interior is responsible for the administration of mineral leases on the OCS, as well as the regulation of mineral exploration and production activities on the OCS.  Plaintiffs Century Exploration New Orleans, LLC (Century) and Champion Exploration, LLC (Champion) are the holders of an oil and gas lease for a tract of submerged land located on the OCS in the Gulf of Mexico.[4]

_____

[2]/  The facts recounted here are taken from the parties' submissions in this case and are undisputed unless otherwise noted.  The court makes no findings of fact in this opinion.

[3]/   Due to the large number of acronyms and other abbreviations used in this opinion, the court has, for the convenience of the reader, provided an appendix defining those terms.

[4]/  Century owns a 90.472222-percent interest in the subject lease, while Champion owns the remaining 9.527778-percent interest.  Century initially purchased the lease at an auction in March 2008, and Champion subsequently acquired a partial interest in the lease from Century.

continue...

Following a massive oil spill in 2010, the government adopted a number of new requirements for drilling operations on the OCS.  In this case, plaintiffs argue that those new requirements repudiated and breached their lease and effected a taking of their property without the payment of just compensation in violation of the Fifth Amendment.  Because the court has stayed proceedings on plaintiffs' takings claim, this opinion addresses only plaintiffs' breach of contract claim. Accordingly, the court's recitation of the facts in this case will be limited to those most relevant to plaintiffs' breach claim.

## A.    Legal Framework for Oil and Gas Exploration and Production on the Outer Continental Shelf

Under the Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. §§ 1331-1356 (2006), the United States exercises jurisdiction and control over the submerged lands of the OCS.[5]  The OCS is defined to include all submerged land that is beyond the outer limits of state jurisdiction (three nautical miles from shore) and within the limits of national jurisdiction (200 nautical miles from shore).  *See* 43 U.S.C. §§ 1301, 1331; *Amber Res. Co. v. United States*, 538 F.3d 1358, 1362 (Fed. Cir. 2008) (*Amber Resources II*).

In enacting OCSLA, Congress explained that "the [O]uter Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).  In addition, OCSLA further provides that "operations in the [O]uter Continental Shelf should

---

[4]/ ...continue
In its overview of the facts, the court will generally refer to both plaintiffs collectively, even where the described event may have occurred before Champion acquired its interest in the lease.

[5]/ OCSLA extends the legal jurisdiction of the United States to "the subsoil and seabed of the [OCS] and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction within a State."  43 U.S.C. § 1333(a)(1). OCSLA, in other words, applies to drilling rigs, production platforms, pipelines, and other structures and facilities, whether permanent or temporary, that are located on the OCS.

be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health." *Id.* § 1332(6).

Under OCSLA, the Secretary of the Interior (Secretary) is charged with issuing and administering leases authorizing private parties to explore the OCS for oil and natural gas and, if such exploration is successful, regulating the production of oil and natural gas from the leased area.  In that regard, OCSLA provides that the Secretary

> shall prescribe such rules and regulations as may be necessary to carry out such provisions.  The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the [O]uter Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter.

43 U.S.C. § 1334(a).  In accordance with those directives, the Secretary has promulgated regulations pursuant to OCSLA.  *See* 30 C.F.R. pt. 250 (2008).[6]

During the relevant time period, Interior issued and administered OCS leases, and regulated exploration and production activities on the submerged lands of the OCS, through the Minerals Management Service (MMS) and its successor agency, the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE).  BOEMRE was subsequently divided into three separate agencies,

---

[6]/  In this opinion, unless otherwise indicated, the court will generally refer to the version of the Code of Federal Regulations (C.F.R.) that was in effect when plaintiffs acquired their lease.  The relevant provisions of the C.F.R. governing OCS leasing, exploration, and development have been relocated from part 250 of title 30 to part 550 of that title.

each with distinct functions and authorities.[7]

The leases issued pursuant to OCSLA "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the development and production plan required by this subchapter." 43 U.S.C. § 1337(b)(4). However, "[t]he issuance and continuance in effect of any lease, or of any assignment or other transfer of any lease, under the provisions of this subchapter shall be conditioned upon compliance with regulations issued under this subchapter." *Id.* § 1334(b).

OCSLA and its implementing regulations establish a multi-stage process for issuing OCS leases and for conducting exploration and production activities under those leases. First, the Secretary develops a five-year plan for lease sales based on the nation's energy needs. Second, the leases are awarded to individual bidders based on competitive auctions. Third, the lessees conduct exploration activities on the leased area to determine whether oil and gas are present. Finally, the lessees conduct development and production activities on the site. Each of these distinct stages is governed by OCSLA and its implementing regulations. *See generally Sec'y of Interior v. California*, 464 U.S. 312, 337-40 (1984).

The leases are awarded to the highest responsible qualified bidder at competitive, sealed-bid auctions conducted pursuant to a five-year plan developed by the Secretary. *See* 43 U.S.C. §§ 1334, 1337, 1344. In developing that plan, the Secretary must "select the timing and location of leasing, to the maximum extent practical, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." *Id.* § 1344(a)(3). In addition, the Secretary must consider, *inter alia*, "relevant environmental and predictive information for different areas of the [O]uter Continental Shelf" in developing the five-year plan.

---

[7]/ In May 2010, the Secretary of the Interior announced that MMS would be split into three separate agencies: the Bureau of Safety and Environmental Enforcement (BSEE), the Bureau of Ocean Energy Management (BOEM), and the Office of Natural Resources Revenue (ONRR). Secretarial Order No. 3299 (May 19, 2010). In June 2010, MMS was renamed BOEMRE. Secretarial Order No. 3302 (June 18, 2010). The revenue-collection functions of BOEMRE were transferred to ONRR in October 2010, and BOEMRE was then divided into two new agencies, BSEE and BOEM, in October 2011. *See* Direct Final Rule, 76 Fed. Reg. 64432 (Oct. 18, 2011).

*Id.* § 1344(a)(2)(H).

Under OCSLA, a lessee must first submit an exploration plan (EP) to Interior for review and approval before conducting any exploration activities under its lease, *see* 43 U.S.C. §§ 1340(c)(1), 1340(e)(2); 30 C.F.R. § 250.201, and Interior must approve or deny the EP within thirty days of receipt, *see* 43 U.S.C. § 1340(c)(1).  The lessee must certify that the EP is consistent with the coastal management plan of any affected state.  *Id.* § 1340(c)(2); 30 C.F.R. §§ 250.226, 250.232, 250.235.  Further, the EP must include an Oil Spill Response Plan (OSRP) for the proposed drilling facilities, or it must incorporate a previously approved regional OSRP.  30 C.F.R. § 250.219(a).  Once an EP is approved by Interior, the lessee must conduct all exploration activities on the site in conformity with the approved EP.  43 U.S.C. § 1340(e)(2).

Following the approval of its EP, an OCS lessee must seek permission to conduct exploratory drilling, as described in its approved EP, by filing an Application for Permit to Drill (APD).  43 U.S.C. § 1340(d); 30 C.F.R. §§ 250.281, 250.410.  If the application meets each of the requirements of the regulations, 30 C.F.R. §§ 250.411-250.418, the lessee can begin exploratory drilling on the site. During the development stage, the lessee must submit either a Development and Production Plan (DPP) or a Development Operations Coordination Document (DOCD), depending upon the location of the lease site, for review and approval by Interior.[8]  43 U.S.C. § 1351; 30 C.F.R. §§ 250.201, 250.241.  In addition, the lessee must file an APD for any production wells it intends to drill, just as it did for its exploratory wells.  30 C.F.R. §§ 250.281, 250.410.

OCSLA directs the Secretary to promulgate regulations "for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit."  43 U.S.C. § 1334(a)(1).  Under OCSLA, the Secretary may issue a suspension "at the request of a lessee, in the national interest, to facilitate proper development of a lease or to allow for the construction or negotiation for use of transportation facilities."  *Id.* § 1334(a)(1)(A).  In addition, the Secretary may issue a suspension without a request from the lessee "if there is a

---

[8]/ DOCDs are issued for development of lease sites within the western Gulf of Mexico, while DPPs are issued for sites elsewhere.  30 C.F.R. § 250.201.  The review and approval process for a DPP is, according to defendant, somewhat more onerous than the process for a DOCD.  *See* Def.'s Mot. at 13 n.9.

6

threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment." *Id.* § 1334(a)(1)(B). In addition to the suspension grounds expressly described in OCSLA, the statute's implementing regulations state that the Secretary may suspend a lease when necessary for the installation of safety or environmental protection equipment. 30 C.F.R. § 250.172(c). In the absence of negligence or willful misconduct on the part of the lessee, the Secretary may extend the duration of a suspended lease for a period of time equal to the length of the suspension. 43 U.S.C. § 1334(a)(1).

Under the regulations in effect when plaintiffs acquired their lease, MMS was authorized to issue Notices to Lessees and Operators (NTLs), which "clarify, supplement, or provide more detail about certain requirements." 30 C.F.R. § 250.103. Further, "NTLs may also outline what [lessees] must provide as required information in [their] various submissions to MMS." *Id.* NTLs are now issued by BOEM. *See* 30 C.F.R. § 550.103 (2012).

## B.    Plaintiffs' Oil and Gas Lease for Ewing Bank 920

In accordance with the Secretary's lease program for the years 2007-2012, the government held an auction in March 2008 (Lease Sale No. 206) for thousands of OCS tracts in the Gulf of Mexico. Def.'s Ex. 5.[9] Plaintiffs submitted the highest bid on a 5760-acre tract known as Block 920, Ewing Bank (EW920).[10] Plaintiffs entered into Lease No. OCS-G 32293 (the lease) on July 8, 2008, and that lease became effective on August 1, 2008. Def.'s Ex. 1. The lease has an initial term running through July 31, 2016, and for as long thereafter as oil and gas are produced from the leased area in paying quantities, or while approved drilling or well re-working operations are conducted on the submerged land, or for as long as otherwise provided by regulation. *Id.* In order to avoid cancellation of their

---

[9]/ In this opinion, citations to "Def.'s Ex. __" refer to the specified exhibit in the appendix to defendant's motion for partial summary judgment, as well as the consecutively numbered exhibits filed with defendant's response and its notice of subsequent developments. Similarly, citations to "Pls.' Ex. __" refer to the exhibits in the appendix to plaintiffs' motion for partial summary judgment, as well as the consecutively numbered exhibits to its reply and notice of subsequent developments.

[10]/ The bid submitted by plaintiffs was more than five times as high as the only other bid submitted for the EW920 lease. *See* Def.'s Ex. 5 at A138.

lease, however, plaintiffs were required to commence an exploratory well on the site no later than July 31, 2013. *See* 30 C.F.R. § 256.37(a)(3).

Plaintiffs made an initial bonus payment of $23,236,314 to acquire the lease, and they have paid the government additional rental payments of $9.50 per acre, per lease year – $54,720 per year – since that initial payment. Further, once the lease is developed, the government is entitled to a specified percentage of the estimated or market value of the oil and gas produced on the leased area as royalty payments, subject to a minimum royalty payment of $9.50 per acre, per lease year. Def.'s Ex. 1 at A1.

On December 22, 2008, plaintiffs submitted their EP for the lease to MMS. *See* Def.'s Ex. 2. The EP contemplated the drilling and completion of five exploratory wells on the leased area and incorporated by reference a regional OSRP approved by MMS in August 2007. *See id.* at A51-A52. In their initial EP, plaintiffs certified that they had "the capacity to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our EP." *Id.* at A52; *see also id.* at A26 ("Century . . . has the financial capability to drill a relief well and conduct other emergency well control operations."). Plaintiffs met their bonding requirements with an area-wide development bond furnished and maintained in accordance with applicable regulations and NTLs then in effect. *See* Pls.' Ex. 4 at 13; Def.'s Ex. 2 at A25. Plaintiffs stated that they anticipated commencing operations under the EP as early as March 2009, "[c]ontingent upon receiving regulatory approvals and based on equipment and personnel availability," Def.'s Ex. 3 at A80, and would complete those operations by October 13, 2009, Def.'s Ex. 2 at A13.

In accordance with the Coastal Zone Management Act of 1972 (CZMA), 16 U.S.C. §§ 1451-1464 (2006), plaintiffs also submitted their proposed EP to the State of Louisiana, which approved the EP on January 29, 2009, through the Department of Natural Resources, Office of Coastal Restoration and Management. *See* Compl. Ex. C; Def.'s Ex. 2 at A62-A66. MMS subsequently approved the EP on February 6, 2009. *See* Def.'s Ex. 4.

Plaintiffs performed a reservoir analysis of the leased area, which indicated "proved reserves" of approximately 12.7 million barrels of oil equivalent (BOE)

and "probable reserves" of approximately 2.4 million BOE.[11]  Those figures were
later confirmed by an independent analysis.  *See* Compl. ¶ 11; Pls.' Ex. 3.
Plaintiffs have not, however, conducted any drilling – exploratory or otherwise –
on the leased area, nor have any of the site's prior lessees conducted any drilling
there.  Def.'s Ex. 3 at A84.

## C.     The Deepwater Horizon Disaster and Subsequent Reforms

On April 20, 2010, an explosion and fire occurred on a semi-submersible
drilling rig, the Deepwater Horizon, during the temporary abandonment of the
Macondo exploratory well in the central Gulf of Mexico.  The explosion killed
eleven workers, and the subsequent loss of the vessel two days later, on Earth Day,
resulted in an oil spill that lasted several months and released 4.9 billion barrels of
crude oil into the Gulf of Mexico.  The blowout preventer (BOP), designed to stop
the flow of oil in the event of a blowout, failed to do so.  The operator of the vessel
made a number of unsuccessful attempts, using various techniques, to stop the flow
of crude oil from the well before finally succeeding on July 15, 2010 – eighty-nine
days after the explosion.  The reservoir was permanently sealed in mid-September.
*See Deep Water:  The Gulf Oil Disaster and the Future of Offshore Drilling*,
National Commission on the BP Deepwater Horizon Oil Spill and Offshore
Drilling, at 1-19, 129-70 (January 2011) (National Commission Report).

In the meantime, more than 45,000 government, industry, and other
personnel were enlisted in the response effort, along with thousands of government
and private vessels and aircraft.  *Id.* at 129-70.  The Deepwater Horizon event was
deemed to be a "spill of national significance" – the first time in history that term
had been used.  *See* 40 C.F.R. § 300.5 (2012) ("Spill of national significance
(SONS) means a spill that due to its severity, size, location, actual or potential
impact on the public health and welfare or the environment, or the necessary
response effort, is so complex that it requires extraordinary coordination of federal,

---

[11]/  The term "proved reserves" essentially refers to the quantity of petroleum that is
expected to be recovered from the leased area with a reasonable degree of certainty, while
"probable reserves" refers to the additional quantity of petroleum that is less likely to be
recovered than proved reserves, but more likely to be recovered than "possible reserves."
Compl. ¶ 11 nn.5-6.  There should be at least a fifty percent probability that the quantity of
petroleum actually recovered will equal or exceed the sum of proved reserves and probable
reserves (also known as "2P").  *Id.* ¶ 11 n.6.

state, local, and responsible party resources to contain and clean up the discharge.").

Following the Deepwater Horizon event, in the summer and fall of 2010, MMS – and then BOEMRE – imposed a number of substantial new regulations and requirements on OCS deepwater drilling operations in the Gulf of Mexico. Plaintiffs allege that these new requirements have substantially increased the economic costs of their performance under the lease and have therefore repudiated and breached that lease.

### 1.     The Safety Measures Report

On April 30, 2010, the President ordered the Secretary to conduct a thorough review of the Deepwater Horizon disaster and to submit a report recommending new safety and environmental safeguards for deepwater drilling within thirty days.[12]  On May 27, 2010, the Secretary issued a report (the Safety Measures Report), which recommended a number of new safety precautions for all deepwater drilling operations on the OCS.  *See* Def.'s Ex. 6.

In the executive summary of the Safety Measures Report, the Secretary recommended a six-month moratorium on all OCS deepwater drilling activity using a floating rig in the Gulf of Mexico, as well as all permitting for such activity, even though there was no specific recommendation for such in the body of the report.  *See id.* at A210.  Following the release of the Safety Measures Report, five of the seven experts consulted by Interior during its investigation indicated that they had not endorsed the decision to impose a six-month moratorium on deepwater operations.  The Secretary contacted those individuals, and apologized for any misunderstanding or confusion created by the executive summary.  *See* Pls.' Ex. 32 at 2.  Interior's Office of Inspector General later investigated the issue, and determined that while the executive summary could have been clearer, that lack of clarity did not violate applicable law.  *See* Pls.' Ex. 36 at 2.

---

[12]/  The President also established an independent, bipartisan commission to investigate the Deepwater Horizon disaster and to make specific recommendations based on that investigation.  The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling issued its report in January 2011.

## 2.    The First Moratorium – NTL-04

On May 28, 2010, the Secretary issued a memorandum to the Director of MMS, ordering him to commence a six-month suspension of all pending, current, and approved offshore drilling operations on new deepwater wells on the OCS. *See* Def.'s Ex. 7.  The memorandum further stated that MMS was not to process any APDs for deepwater wells during that six-month period.  *Id.*  The Secretary invoked two regulatory bases for his decision.  First, he determined that "at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable risk of serious and irreparable harm to wildlife and the marine, coastal, and human environment."  *Id.* (citing 30 C.F.R. § 250.172(b)). Second, the Secretary "determined that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."  *Id.* (citing 30 C.F.R. § 250.172(c)). The Secretary explained that his decision was based on Interior's thirty-day review of the Deepwater Horizon disaster, the Safety Measures Report, and the Secretary's "further evaluation of the issue."  *Id.*

On May 30, 2010, the Deputy Director of MMS issued Notice to Lessees No. 2010-N04 (NTL-04), which provided details on the six-month moratorium on deepwater drilling and permitting.  Def.'s Ex. 8.  The notice explained that MMS would not consider applications to drill deepwater wells for a period of six months, and further noted that MMS would issue directed suspensions to lessees currently conducting such operations.[13]  NTL-04 referenced the Secretary's May 28, 2010 memorandum and the Safety Measures Report as supporting the moratorium. *See id.* at A254.  The notice stated that the six-month moratorium would not apply to intervention or relief wells drilled for emergency purposes.  With respect to all other active drilling operations, however, the notice provided that affected lessees "must proceed at the next safe opportunity to secure the well and take all necessary

---

[13]/  NTL-04 explained that "[f]or the purposes of this Moratorium NTL, deepwater means depths greater than 500 feet."  Def.'s Ex. 8 at A253.  Plaintiffs appear to challenge that definition of deepwater, arguing that it was inconsistent with an earlier NTL defining that term to include only operations in depths greater than 400 meters (1312 feet).  *See* Pls.' Mot. at 25.  However, the relevance of that apparent discrepancy is unclear, as plaintiffs' proposed activities would meet either definition of deepwater.  *See* Pls.' Ex. 4 at 13 (noting that plaintiffs planned to drill five exploratory wells in approximately 1500 feet of water); Pls.' Ex. 8 at 5 (same); Def.'s Ex. 2 at A14-A18 (same).

steps to cease operations and temporarily abandon or close the well until [they] receive further guidance from the Regional Supervisor for Field Operations." *Id.* at A253.

On June 22, 2010, a district court in Louisiana issued a preliminary injunction enjoining the Secretary's enforcement of the first moratorium. *See Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010). The Secretary appealed to the United States Court of Appeals for the Fifth Circuit, but that court dismissed the appeal as moot when the Secretary later rescinded the first moratorium on July 12, 2010. *See Hornbeck Offshore Servs., LLC v. Salazar*, 396 Fed. App'x 147 (5th Cir. 2010).

### 3.    New Safety Measures – NTL-05

On June 8, 2010, MMS issued Notice to Lessees No. 2010-N05 (NTL-05), entitled "Increased Safety Measures for Energy Development on the OCS," which imposed new and increased substantive requirements on drilling operations. *See* Def.'s Ex. 11. The new requirements set forth in NTL-05 applied to all OCS activity, whether in deepwater or in shallow water. NTL-05 adopted various recommendations described in the Safety Measures Report, and which, in the view of MMS, warranted immediate implementation. In addition to imposing new information and inspection requirements for BOPs, NTL-05 required the chief executive officers (CEOs) of affected operators to certify, under threat of criminal penalties for false statements, that the operators were in compliance with the operating regulations set forth in Part 250 of the Code of Federal Regulations (C.F.R.), as well as the operators' compliance with several other conditions. *See generally* Pls.' Ex. 4 at 16-18.

On October 19, 2010, the same district court that enjoined the enforcement of the first moratorium set aside NTL-05 because, according to the court, it imposed new substantive requirements on drilling operations but was not promulgated in accordance with the required process of notice-and-comment rulemaking. *See Ensco Offshore Co. v. Salazar*, No. 10-1941, 2010 WL 4116892 (E.D. La. Oct. 19, 2010).

### 4.    New Information Requirements – NTL-06

On June 18, 2010, MMS issued Notice to Lessees No. 2010-N06 (NTL-06),

entitled "Information Requirements for Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents on the OCS," which rescinded certain limitations set forth in an earlier notice to lessees (Notice to Lessees No. 2008-G04) regarding the information that operators were required to submit with EPs, DPPs, and DOCDs on blowout and worst-case discharge scenarios. *See* Def.'s Exs. 13-14; Pls.' Ex. 4 at 18-20. NTL-06 appears to be the most significant obstacle to plaintiffs' performance under the lease, and its impacts on plaintiffs will be addressed more fully below.

### 5.      The Second Moratorium

On July 12, 2010, the Secretary issued a memorandum that rescinded the first moratorium, but also ordered BOEMRE to issue new suspensions and a freeze on permitting based upon a second deepwater moratorium to be in effect through November 30, 2010. *See* Def.'s Ex. 18. In contrast to the May 2010 moratorium, which applied to all deepwater drilling activities, the July 2010 moratorium applied only to operations using subsea BOPs or surface BOPs on floating facilities.

Following the permanent closure of the infamous Macondo well in September 2010, the Director of BOEMRE issued a memorandum to the Secretary recommending that the second moratorium – both the suspensions of drilling operations and the prohibition on new permits – be lifted immediately. On October 12, 2010, the Secretary terminated the second moratorium in a decision memorandum, but also ordered the Director of BOEMRE to require the CEO of any operator seeking to perform deepwater drilling that would have been subject to the now-terminated moratorium to certify that the operator had complied with all applicable regulations. *See* Def.'s Ex. 19 at A404. In addition, the memorandum also requires each operator to "demonstrate that it has in place written and enforceable commitments, pursuant to applicable regulations, that ensure that containment resources are available promptly in the event of a deepwater blowout." *Id.*

### 6.      The Categorical Exclusions Memorandum

On August 16, 2010, the Director of BOEMRE directed the agency to stop using certain categorical exclusions in performing reviews of drilling operations under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, 4331-4335 (2006). Under NEPA, the federal government is required to consider

the environmental consequences of its actions.  In doing so, the agency first performs an environmental assessment (EA) to determine whether a proposed action will have a significant impact on the environment.  If the agency answers that question in the negative, it issues a finding of no significant impact (FONSI).  If the agency determines that its proposed action will have a significant impact on the environment, it must prepare a more extensive environmental impact statement (EIS).  Under regulations promulgated pursuant to NEPA, federal agencies may categorically exclude certain types of actions from the requirement to perform an EA or an EIS.  *See* 40 C.F.R. §§ 1500.4(p), 1508.4 (2012).  Before the Director's memorandum, EPs were categorically excluded from NEPA review; now, those plans had to meet the requirements of NEPA.

### 7.     The Drilling Safety Rule

The Drilling Safety Rule (DSR) codified the new protocols contained in NTL-05, as well as a number of new safety requirements recommended in the Safety Measures Report.  The rule was first published without notice or comment, and became effective immediately upon its publication in the Federal Register on October 14, 2010.  75 Fed. Reg. 63346 (Oct. 14, 2010); *see* Def.'s Mot. Exs. 22-23.  The DSR was later published as a final rule, following a comment period, on August 22, 2012.  77 Fed. Reg. 50856 (Aug. 22, 2012); *see* Pls.' Ex. 33. The court need not describe each of the specific provisions of the DSR here; there appears to be no dispute that the rule contains new substantive requirements related to well bore integrity and well control equipment and procedure, *see* Pls.' Ex. 4 at 26-27, which would impose substantial costs on operators and lessees, *see id.*

### 8.     The Workplace Safety Rule

BOEMRE published another regulation, the Workplace Safety Rule (WSR), the day after it published the DSR in the Federal Register.  75 Fed. Reg. 63610 (Oct. 15, 2010).  The WSR requires each OCS operator to develop and implement a Safety and Environmental Management System (SEMS) for its operations. Like the DSR, the WSR imposed new substantive requirements on OCS operators; unlike the DSR, however, the WSR was not developed or issued in direct response to the Deepwater Horizon disaster.  Instead, the rule issued on October 15, 2010, was the final version of a rule first published in the Federal Register as an advanced notice of proposed rulemaking in May 2006, *see* 71 Fed. Reg. 29277 (May 22, 2006), and then as a notice of proposed rulemaking in June 2009, *see*

14

74 Fed. Reg. 28639 (June 17, 2009).  In other words, the rulemaking process that culminated in the WSR was initiated long before plaintiffs acquired their lease.

### 9.    CEO Compliance Statement and Enhanced Scrutiny of Containment Resources – NTL-10

On November 8, 2010, BOEMRE issued Notice to Lessees No. 2010-N10 (NTL-10), which requires the CEO statement discussed in the October 12, 2010 memorandum.  *See* Def.'s Ex. 26.  NTL-10 also informed lessees that they must submit information with their OSRPs regarding their access to and deployment of containment resources, and that such information would be subject to additional scrutiny by BOEMRE.  NTL-10 was later replaced by rules published in the Federal Register following the process of notice-and-comment rulemaking.  *See* Pls.' Ex. 4 at 29.

### 10.    The December 2010 Clarification Document

On December 13, 2010, BOEMRE released a guidance document to clarify the meaning of many of its actions, such as NTL-06, the new Drilling Safety Rule, the required NEPA assessments, and the NTL-10 compliance statement.  *See* Def.'s Exs. 27-28.  Plaintiffs do not contend that this document imposed any new requirements that were not already included in earlier NTLs or regulations.

### D.    Subsequent Action on Plaintiffs' Lease

On June 16, 2011, the Secretary sent a memorandum to BOEMRE, in which he ordered the agency to establish an expedited process for OCS lessees to request and obtain one-year suspensions and extensions of their leases.  *See* Def.'s Ex. 29. On June 29, 2011, BOEMRE issued NTL No. 2011-N05, which implemented the Secretary's orders.  *See* Def.'s Ex. 30.  In order to obtain a suspension and extension under that notice, an OCS lessee was required to certify that:  (1) no oil or gas had been produced from the leased area as of May 15, 2011; (2) the leased area is under at least 500 feet of water (*i.e.*, in deepwater); and (3) the lease is set to expire on or before December 31, 2015.  *Id.* at A529.  Plaintiffs requested a suspension of their lease on July 5, 2011, *see* Def.'s Ex. 31, and BOEMRE approved plaintiffs' request on August 11, 2011, *see* Def.'s Ex. 32.

Under applicable regulations, OCS lessees are required to submit a revised

OSRP for approval every two years.  *See* 30 C.F.R. § 254.30(a).  Plaintiffs' EP was based on a regional OSRP submitted in May 2007 and approved in August of that year.  *See* Def.'s Ex. 2 at A51; Pls.' Ex. 1 at 9.[14]  Plaintiffs continued to revise their regional OSRP in accordance with the regulations, even after the occurrence of the governmental actions challenged in this case, and BSEE approved the most recent revision to plaintiffs' OSRP on November 8, 2012.  *See* Def.'s Exs. 16-17, 40.  Plaintiffs have continued to make the required rental payments under their lease, even after the events that plaintiffs view as a repudiation and total breach of the lease.  Plaintiffs have not, however, ever filed an APD to conduct any exploratory drilling on the leased area.

## II.    Procedural History

On January 25, 2011, Century filed its three-count complaint in this matter.[15]  In its complaint, Century asserts that the government breached its lease agreement with plaintiffs (Count I); that it effected an uncompensated taking of its private property in violation of the Fifth Amendment (Count II); and that the government's activities may have given rise to other, unspecified causes of action (Count III).  Century asserts that the government's actions in this case violated various sections of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706 (2006), and applicable regulations.  Century requests a money judgment for its expectation damages under the lease or lost profits, whichever is greater.  In the alternative, Century seeks as just compensation the fair market value of its interest in the lease.  In the pre-suit notice sent to the government, Century asserted that its lost profits are equal to approximately $650 million.  Def.'s Ex. 37 at A555.

On April 5, 2011, defendant filed a motion to order the joinder of Champion

---

[14]/  Plaintiffs' regional OSRP was first approved as early as 2004, *see* Pls.' Ex. 1 at 3, and was revised a number of times before the August 2007 approval, *see id.* at 4-9.  The most recent revision of the OSRP uses EW920 as the basis for the worst-case discharge scenario, while the earlier versions of the plan used a different lease tract known as Ship Shoal 153.

[15]/  On November 23, 2010, Century sent to the President, the Secretary of the Interior, the Director of BOEMRE, local BOEMRE officials, and the Governor of Louisiana a letter that provided notice of Century's claims and requested a decision on those claims within sixty days as required under OCSLA, 43 U.S.C. § 1349(a)(2)(A).  The letter and supporting documents were delivered to the United States on November 24, 2010.  Century received no response from the government within the sixty-day time period.  *See* Def.'s Ex. 37.

pursuant RCFC 19(a).  In the alternative, defendant asserted that the instant suit must be dismissed in its entirety pursuant to RCFC 12(b)(7) and RCFC 19(b) should joinder of Champion prove to be infeasible.  In the same motion, defendant argued that the takings claim raised in Count II of the complaint must be dismissed under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  Because the property rights at issue in plaintiffs' takings claim were created by the lease that plaintiffs allege has been breached, defendant argued that plaintiffs must seek relief under a breach of contract theory, not under a takings theory.

On June 21, 2011, the court issued an order directing the Clerk's Office to notify Champion of the pendency of this action as a potentially interested party pursuant to RCFC 14(b).  That notice was duly issued by the Clerk's Office on July 19, 2011, and Champion subsequently filed a complaint against defendant, in accordance with RCFC 14(c), on September 12, 2011.  In its complaint, Champion adopted the allegations set forth in the initial complaint filed by Century, but also reserved its right to make an election of remedies at a later date.  Following briefing and oral argument on defendant's motion to dismiss under RCFC 12(b)(6), the court denied that motion on January 24, 2012, and stayed further proceedings on plaintiffs' takings claim pending the resolution of their breach of contract claim.  Defendant filed separate answers to plaintiffs' complaints on March 9, 2012.

On July 13, 2012, defendant filed a motion for partial summary judgment on plaintiffs' breach of contract claim.[16]  In that motion, the government argues that it did not breach any express term of plaintiffs' lease, nor did it breach the implied duty of good faith and fair dealing.  In the alternative, defendant argues that even if there had been a breach in this case, the government is still shielded from liability under the sovereign acts doctrine.  Finally, the government asserts that, should the court conclude that there was a breach in this case, and that the government is not protected from liability by the sovereign acts doctrine, plaintiffs are precluded from seeking damages for a total breach under the election of remedies doctrine.

---

[16]/ The parties filed a Joint Preliminary Status Report (JPSR) on April 27, 2012.  In the JPSR, the government proposed a schedule for the filing and briefing of dispositive motions by the parties.  Plaintiffs, in contrast, argued that the parties should be afforded an opportunity to conduct discovery before any further motions practice.  The court established a briefing schedule for dispositive motions from the parties, but informed plaintiffs that the court would consider a motion under RCFC 56(d) at the appropriate time.  *See* Scheduling Order of May 4, 2012.

On September 10, 2012, plaintiffs responded to the government's motion and filed their own cross-motion for partial summary judgment.  In their motion, plaintiffs argue that the government's actions following the Deepwater Horizon disaster breached the express terms of their lease, as well as the implied duty of good faith and fair dealing.  Plaintiffs further assert that defendant cannot invoke the sovereign acts doctrine in this case because the government's actions were not public and general, but were instead targeted at its obligations under OCS leases.  Finally, plaintiffs argue that the election of remedies doctrine does not preclude their action for total breach because plaintiffs' post-breach actions were for the sole purpose of mitigating their damages.

Defendant filed its response and reply on October 30, 2012, and plaintiffs filed their reply on November 13, 2012.  In addition, defendant filed a notice of subsequent developments in the case on December 11, 2012, and plaintiffs filed a similar notice on February 5, 2013.  The court heard oral argument on the parties' cross-motions for partial summary judgment on February 12, 2013.

## DISCUSSION

### I.      Standard of Review

"[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action."  *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted).  The moving party is entitled to summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a). A genuine issue of material fact is one that could change the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the . . . court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56[], is satisfied."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a

genuine issue of material fact." *Id.* (quoting former version of Fed. R. Civ. P. 56(c)). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249-50; *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984). "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag*, 731 F.2d at 836. Any evidence presented by the non-movant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Issues of contract interpretation are amenable to summary judgment. *See San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) ("Whether a contract creates a duty is a legal question of contract interpretation."); *see also Varilease Tech. Grp. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment."); *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) ("Contract interpretation is a matter of law and thus is amenable to decision on summary judgment.").

## II.     Analysis of the Cross-Motions for Partial Summary Judgment

The parties have filed cross-motions for partial summary judgment. Defendant argues that there are no genuine issues of material fact in this case, and that it is entitled to judgment as a matter of law with respect to whether plaintiffs' lease has been breached and whether the government would be shielded from such a breach under the sovereign acts doctrine. Plaintiffs, in contrast, argue that there are no disputed issues of material fact with respect to their own motion, but contend that there are such disputes with respect to the government's motion. Plaintiffs assert that they are entitled to judgment as a matter of law on the issue of liability.

### A.    Applicable Law

Plaintiffs seek damages for the government's alleged breach of contract, which requires plaintiffs to demonstrate:  (1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach.  *San Carlos*, 877 F.2d at 959.  Defendant does not dispute that the lease in this case is a contract; rather, the dispute between the parties is whether the government has breached any of its duties under the lease. *See Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604 (2000) (holding that offshore leases issued pursuant to OCSLA are contracts); *Amber Res. Co. v. United States*, 68 Fed. Cl. 535 (2005) (*Amber Resources I*) (same), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008).

Plaintiffs argue that the government's conduct with respect to OCS leases following the Deepwater Horizon disaster was a repudiation of those leases, resulting in a total breach.  "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."  *Lynch v. United States*, 292 U.S. 571, 579 (1934).  In applying private contract law to OCS leases, the court may look to the Restatement of Contracts for guidance.  *See Mobil Oil*, 530 U.S. at 608.

When the performance of a duty under a contract is due, nonperformance of that duty is a breach of the contract.  Restatement (Second) of Contracts § 235 (1981).  Nonperformance of a duty will be considered a total breach when "it so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance."  *Id.* § 243.  In addition, an obligor may commit a breach through repudiation, which is defined as "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."  *Id.* § 250.

### B.    The Government Did Not Repudiate or Otherwise Breach Plaintiffs' Lease

For the reasons discussed below, the court concludes that the government's actions in this case did not breach any of the express terms of plaintiffs' lease. Plaintiffs cannot, moreover, challenge the substantive validity of the government's actions in this court on the asserted basis that section 1 of the lease incorporated

the judicial review provisions of the APA as an express term of the lease.  Finally, the court holds that the government did not breach its implied duty of good faith and fair dealing in enacting the comprehensive reform measures challenged by plaintiffs in this case.

### 1.    None of the Challenged Governmental Actions Breached Any Express Term of Plaintiffs' Lease

It is difficult to discern which specific terms of the lease, according to plaintiffs, have been breached by the government in this case.  Plaintiffs argue that the government has changed the rules governing offshore exploration and production in unexpected ways, and that those changes have rendered plaintiffs' performance under the lease commercially impracticable.  In plaintiffs' view, those actions have breached both section 1 and section 2 of their lease.  Plaintiffs further argue that NTL-06 has breached section 8 of their lease.  For the reasons discussed below, the court concludes that none of those actions breached any express term of plaintiffs' lease.

### a.    The New Regulations Did Not Breach the Lease

Under section 2 of the lease, the government "grant[ed] and lease[d] to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the [leased area]." Def.'s Ex. 1 at A1.  Plaintiffs argue that the new regulations have breached the terms of the lease by destroying the fruits of its bargain with the government. Plaintiffs assert that performance under the lease has been rendered commercially impracticable due to the new requirements imposed by the DSR and the WSR.

Section 2 of the lease does not, however, grant plaintiffs an absolute right to conduct exploration or production activities on the leased area.  Rather, because those rights are qualified by the need to obtain various approvals, "the contract, in practice, amount[s] primarily to an *opportunity* to try to obtain exploration and development rights in accordance with the procedures and under the standards specified in the cross-referenced statutes and regulations." *Mobil Oil*, 530 U.S. at 620; *see also Sec'y of Interior v. California*, 464 U.S. 312, 317 (1984) ("A lessee does not . . . acquire an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorizations."); *Amber Resources II*, 538 F.3d at 1371 (noting that OCS leases do

not "give the lessees any ultimate rights to develop the leases or produce oil and gas, and that granting permission for ongoing exploration and development was clearly a matter subject to the discretion of the Department of the Interior").

When they executed their lease, the parties shared a mutual understanding that the law governing exploration and development under the lease might change in the future, and the terms of the lease expressly provided for such change in section 1:

> This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. § 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act").  The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

Def.'s Ex. 1 at A1.

Under section 1, the lease is subject to the terms of OCSLA and any other "applicable statutes" that were in effect when the lease was executed.  In addition, the lease is subject to any "applicable regulations" that were in effect at the time of lease execution.  Finally, the lease is subject to future regulations, as long as they are issued pursuant to OCSLA and "provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein."  *Id.*

On the other hand, section 1 makes it equally clear that the lease is not subject to existing statutes or regulations that are not "applicable."  Further, the lease is not subject to subsequently enacted statutes or to later amendments to existing statutes.  Thus, section 1 allocates the risk of certain legal changes – future regulations issued pursuant to OCSLA – to plaintiffs, and it allocates the risk of other legal changes – future statutes, amendments of existing statutes, and future regulations issued pursuant to statutes other than OCSLA – to the government.

22

This reading is consistent with the Supreme Court's decision in *Mobil Oil* and with the Federal Circuit's decision in *Amber Resources II*.  In *Mobil Oil*, the Supreme Court addressed whether the enactment of the Outer Banks Protection Act (OBPA), Pub. L. No. 101-380, § 6003, 104 Stat. 484, 555 (1990), breached several OCS leases.  OBPA prevented MMS from approving any plan or permit for drilling operations off the North Carolina coast before the Secretary received recommendations from a newly created environmental review panel and made a report to Congress based upon those recommendations.  OBPA further provided that no such approvals were to occur, in any event, for a period of at least thirteen months.  The plaintiffs in that case asserted that the new statute breached their OCS leases because those leases incorporated the terms of OCSLA, which required that EPs be approved within thirty days.  The Supreme Court agreed, explaining that "under the contracts, the incorporated procedures and standards amounted to a gateway to the companies' enjoyment of all other rights."  *Mobil Oil*, 530 U.S. at 620.  In the Court's view, OBPA significantly narrowed that gateway and therefore materially breached the plaintiffs' leases.

The Federal Circuit followed the same approach in *Amber Resources II*. There, an amendment to the CZMA created a new role for coastal states in MMS's review of lessee-requested suspensions.  The court first noted that section 1 of the OCS leases in that case – which was largely identical to section 1 of the lease in this case – did not incorporate future statutes.  For that reason, the court concluded that the amendment to the CZMA was not incorporated into the plaintiffs' leases. *Amber Resources II*, 538 F.3d at 1371-72.  The court further held that the CZMA amendment effected a substantial change in the governing procedures for granting lessee-requested suspensions and therefore breached the plaintiffs' leases.

In both cases, the ultimate result was based on a preliminary determination that the leases at issue did not incorporate future statutory changes.  Those cases did not hold, however, that the government assumes the risk of future *regulations*, at least not those issued under OCSLA.  *See id.* at 1368 ("[W]e treat the lease agreements as incorporating by reference any statutes or regulations that were in effect at the time of the leases' execution and any regulations promulgated pursuant to those statutes."), 1371 (noting that the lessees in *Mobil Oil* "bargained for a right to explore for and extract oil and gas from the leases, subject to a particular *statutory* regime") (emphasis added).

Plaintiffs argue that section 1 cannot be interpreted to subject their lease to

every future regulation issued pursuant to OCSLA because such an interpretation would render their contract illusory. The court agrees that a contract subject to the unbounded discretion of the government would be illusory and thus unenforceable. *See Torncello v. United States*, 681 F.2d 756, 760 (Ct. Cl. 1982) (explaining that a contracting party "may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void"); *see also Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1357 (Fed. Cir. 2009) ("[T]here is the obvious question of whether making the contracts subject to whatever future federal law or policy may hold would make the contracts illusory."). In this case, however, section 1 does not grant the government unfettered authority to change the rules during the game; instead, its discretion is cabined by an important limiting principle.

Section 1 of the lease creates a substantial degree of certainty for lessees by allocating to the government the risk of future statutory changes, while allocating to the lessee the risk of future regulations issued pursuant to a single statute, to which the lease is expressly subject. As this court explained in *Amber Resources I*, 68 Fed. Cl. at 547, "[a] regulation's scope and effect . . . are subject to the enabling statute." For that reason, "subjecting a lease to any future regulation issued pursuant to the OCSLA limits the lease's modification to the contours of that act." *Id.* The lease is subject only to future regulations issued pursuant to OCSLA, which constrains the scope and content of those regulations. In short, plaintiffs are entitled to a stable statutory regime under section 1 of the lease, but they assumed the risk of future regulatory changes within the context of that statutory regime.

In addition to section 1, a number of other sections in the lease describe plaintiffs' obligation to conduct their activities in accordance with controlling regulations. The lease provides in section 9, for example, that all operations on the leased area must be conducted "in accordance with approved exploration plans and approved development and production plans as are required by regulations." Def.'s Ex. 1 at A2. Section 10 of the lease states that "[t]he Lessee shall comply with all regulations and Orders." *Id.* Further, section 12 of the lease provides that the lessee must "maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the [OCS]." *Id.* at A6.

There is no dispute that plaintiffs' lease is subject to the terms of OCSLA, which is expressly incorporated into their lease by reference. The statute provides

in part that "[t]he Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the [OCS]." 43 U.S.C. § 1334(a).  Importantly, OCSLA provides that any regulations issued under the statute apply to both new and existing leases as of their effective date. *See id.* ("[N]otwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued *or maintained* under the provisions of this subchapter.") (emphasis added).

The Secretary's ability to regulate offshore operations pursuant to OCSLA does not provide the government with a "route of complete escape" from its duties under its contract with plaintiffs.  *See Torncello*, 681 F.2d at 769 ("It is hornbook law . . . that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract.").  Indeed, the ability to regulate is essential to the discharge of the Secretary's statutory duty to prevent waste and conserve the natural resources of the OCS.  *See* 43 U.S.C. § 1334(a).

Here, the regulations challenged by plaintiffs – the DSR and the WSR – are amendments to the regulations that implement OCSLA, and were themselves promulgated pursuant to OCSLA.  *See* Def.'s Exs. 22, 24; 30 C.F.R. § 250.101. For that reason, plaintiffs' lease is subject to those regulations under section 1. Plaintiffs argue that the regulations nonetheless breached the lease because they were not issued for the purpose of preventing waste and conserving the resources of the OCS.  *See* Pls.' Reply at 17.  Plaintiffs' assertions in that regard are both unsubstantiated and irrelevant in the context of an action for breach of contract. Plaintiffs may challenge the substantive validity of the regulations in district court, but they may not do so here.  *See Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993).[17]  In sum, neither the DSR nor the WSR breached any term of plaintiffs' lease.

### b.  Neither of the Moratoria Breached the Lease

Plaintiffs assert that the moratoria that were in effect from May 2010 until October 2010 breached their lease.  The moratoria, according to plaintiffs, harmed

---

[17]/  Plaintiffs argue that the judicial review provisions of the APA are incorporated into the lease by reference (in section 1) and thus allow plaintiffs to sue for damages in this court based on alleged violations of the APA.  The court addresses that argument more fully *infra*.

them in two ways.  First, plaintiffs assert that the first moratorium diminished the availability of drilling rigs and personnel in the Gulf of Mexico.  Compl. ¶¶ 17-18. Further, plaintiffs assert that the second moratorium, in combination with other regulatory measures, increased plaintiffs' borrowing costs by preventing drilling on the leased area.  Pls.' Mot. at 52-53; Pls.' Ex. 12 ¶¶ 3-4.  The court concludes that the moratoria did not breach any term of plaintiffs' lease.

The first moratorium was implemented through NTL-04 on May 30, 2010. *See* Def.'s Ex. 8.  NTL-04 informed lessees that MMS would not consider any applications to conduct deepwater drilling operations for a period of six months, *i.e.*, until November 30, 2010, and also instructed lessees to terminate any such operations at the next safe opportunity.  The first moratorium was in effect for approximately four weeks before it was preliminarily enjoined by a district court on June 22, 2010.  *See Hornbeck*, 696 F. Supp. 2d at 639.  On July 12, 2010, the Secretary issued a decision memorandum, which rescinded the first moratorium and imposed a new moratorium, to remain in effect until November 30, 2010.[18] *See* Def.'s Ex. 18.  Based on a recommendation from the BOEMRE Director, the Secretary lifted the second moratorium on October 12, 2010.  *See* Def.'s Ex. 19.

Both moratoria did two things:  first, they suspended drilling operations in deepwater, and, second, they temporarily ceased permitting for such activities. There is no dispute that plaintiffs were not affected by the suspensions because plaintiffs were not conducting any drilling operations on the site, nor had they submitted an application to do so.  MMS issued letters to the lessees who were actually conducting such operations pursuant to their leases; plaintiffs were not among them.  *See* Def.'s Ex. 8 at A253 ("Under 30 CFR 250.172, the Regional Supervisor for Production and Development will issue Suspensions of Operations (SOO) to all OCS Lessees and Operators currently drilling or proposing to drill new deepwater wells consistent with this Moratorium NTL."); Def.'s Ex. 18 at A395 ("I direct you to withdraw the suspension letters issued under [NTL-04], and I direct you to issue new suspensions . . . .  To provide certainty to affected

---

[18]/  The first moratorium applied to activities in more than 500 feet of water, while the second moratorium applied to operations using a subsea BOP or a surface BOP on a floating facility, without regard to water depth.  As explained in the Secretary's memorandum, however, both moratoria generally applied to the same facilities because "as a practical matter, 500 feet of depth is the typical trigger for needing to use floating drilling facilities."  Def.'s Ex. 18 at A382.

operators, please issue the suspension orders promptly.").[19]

Plaintiffs never submitted an APD that might have been considered and approved by MMS in the absence of the moratoria, but they argue that doing so would have been futile. Plaintiffs state that they intended to conduct operations under their lease in 2010, and that the moratoria prevented them from doing so. It is far from clear, however, that the moratoria had any real effect on plaintiffs' ability to move forward with their plans. Plaintiffs submitted their EP to conduct operations under the lease on December 22, 2008, *see* Def.'s Ex. 2, and MMS approved that EP on February 6, 2009, *see* Def.'s Ex. 4. In their EP, plaintiffs stated that they planned to commence operations under their lease by March 2009. Def.'s Ex. 2 at A13; *see also* Def.'s Ex. 3 at A80. But plaintiffs had not filed an application to pursue those operations by the time of the explosion on the Deepwater Horizon more than a year later, on April 20, 2010, nor have they made any attempt to file an application since that time. Further, the second moratorium was terminated more than two years ago, and plaintiffs have not yet filed an application for a drilling permit. Plaintiffs' assertion that a total breach of their lease resulted from an inability to secure a drilling permit during the four months the moratoria were in effect is untenable. The court further notes that plaintiffs requested, and were granted, a one-year extension of their lease. *See* Def.'s Exs. 31-32.

Even if plaintiffs had submitted an application during the moratoria, and MMS had refused to consider that application while the two moratoria were in effect, it is far from clear that the resulting delay would have breached their lease. In *Sun Oil Co. v. United States*, 572 F.2d 786 (Ct. Cl. 1978), the Court of Claims concluded that the government's delay in approving the plaintiffs' application to install a production platform on one of the two oil fields covered by their lease

---

[19]/ Even if plaintiffs had been operating under their lease and had received a suspension pursuant to either of the moratoria, the suspension would not have breached plaintiffs' lease. Section 13 of the lease states that "[t]he Lessor may suspend or cancel this lease pursuant to section 5 of the Act," Def.'s Ex. 1 at A6, and the referenced section of OCSLA, as well as its implementing regulations, authorize suspensions of the type at issue in this case, *see* 43 U.S.C. § 1334(a)(1)(B); 30 C.F.R. § 250.172. Plaintiffs' argument that the suspensions were infirm because they were issued as part of a blanket moratorium, rather than as individual suspensions, is without merit because BOEMRE issued a suspension letter to each affected lessee or operator.

following a blowout at another nearby well did not breach the plaintiffs' lease.[20] The plaintiffs in that case argued that the government had delayed the approval of their application for more than six months.  The court, however, first explained that "[t]he blow out was a devastating event and required careful, prudent and cautious actions by Interior to control the oil spill first, and, second, to assure that such a blow out did not occur again."  *Id.* at 804.  The court noted that under OCSLA, "the Secretary was responsible for the administration of [OCS] leases and was under a duty to protect the environment against waste and to conserve natural resources."  *Id.*  For that reason, according to the court, "it was not only reasonable, but also the legal obligation of the Secretary to employ procedures different from those followed prior to the blow out to assure that such disasters would not occur." *Id.*

The temporary pause in deepwater permitting in this case was well within the government's authority under both the terms of the lease and applicable law. Furthermore, plaintiffs' operations under the lease were never suspended because there were no active operations to suspend.  Plaintiffs never attempted to secure a drilling permit.  Even if plaintiffs had filed an application for a drilling permit, and the approval of that permit had been delayed due to the moratorium, such a short delay would not have effected a total breach of the lease, particularly in light of the absence of any express deadlines for the review and approval of APDs in the lease, under the statute, or under the regulations.  Finally, the circumstances that resulted in the implementation of the moratorium, described in exhaustive detail in the Secretary's memorandum, *see* Def.'s Ex. 18, demonstrate that any hypothetical delay would have been entirely reasonable, *see Sun Oil*, 572 F.2d at 804.  Neither of the moratoria breached plaintiffs' lease.[21]

---

[20]/  The blowout in that case occurred off the coast of Santa Barbara, California, and, until the Deepwater Horizon disaster in 2010, had been the largest oil spill in U.S. history.  *See* National Commission Report at 28-29.

[21]/  Plaintiffs also assert that there was a sustained downturn in the rate of permit issuance – the cleverly named "permitorium" – following the termination of the second moratorium.  *See* Pls.' Mot. at 58-59; Pls.' Ex. 7.  Plaintiffs do not explain how an apparent slowdown in the issuance of permits to other lessees could somehow breach their own lease, aside from noting their claimed inability to obtain a permit under the modified regulatory regime.

## c.       The Notices to Lessees Did Not Breach the Lease

Plaintiffs further contend that notices issued to lessees by MMS and
BOEMRE – NTL-05, NTL-06, and NTL-10 – breached the terms of their lease.[22]
Plaintiffs argue that none of the notices could have been reasonably foreseen by the
parties at the time of contracting, and that each of the notices has dramatically
increased their costs of performance under the lease.  For the reasons discussed
below, the court concludes that none of those notices breached any express term of
plaintiffs' lease.

Section 10 of plaintiffs' lease states that "[t]he Lessee shall comply with all
regulations *and Orders*."  Def.'s Ex. 1 at A2 (emphasis added).  In addition, the
lease is further modified by Stipulation No. 8, which states that "[t]he lessee and its
operators, personnel, and subcontractors are responsible for carrying out the
specific [environmental] mitigation measures outlined in the most current MMS
Notices to Lessees, which interpret requirements in the above-mentioned
implementing regulations," which the stipulation defines as 30 C.F.R. Part 250.[23]
Def.'s Ex. 1 at A5.  Accordingly, there is no question that the lease contemplated
the government's issuance of NTLs, and requires plaintiffs, as well as their
operators, employees, and subcontractors, to meet the requirements of the "most
current" NTLs issued under OCSLA's implementing regulations.

Plaintiffs do not dispute that their lease incorporated the regulations in effect
when the lease was executed.  Those regulations provide that "MMS may issue
Notices to Lessees and Operators (NTLs) that clarify, supplement, or provide more
detail about certain requirements."  30 C.F.R. § 250.103.  Further, "NTLs may also
outline what [lessees and operators] must provide as required information in [their]

---

[22]/  Plaintiffs argue that NTL-04 breached their lease as well, but the court has already
addressed that notice *supra*.  In addition, it appears – although it is not clear – that plaintiffs also
assert that NTL No. 2012-N06 breached their lease.  *See* Pls.' Mot. at 12.

[23]/  While the primary focus of Stipulation No. 8 is the protection of marine mammals and
other threatened and endangered species, *see* Def.'s Ex. 1 at A5, that provision also notes that the
general purpose of OCSLA is to promote the expeditious and orderly development of the OCS
subject to environmental safeguards, and then references the implementing regulations for
OCSLA contained in Part 250 of the Code of Federal Regulations.  Further, the requirement that
lessees and their operators, employees, and subcontractors comply with the most current NTLs is
not expressly limited to the protection of marine mammals or other species.

various submissions to MMS." *Id.* Defendant notes that the government has issued NTLs for those purposes since 1992. *See* Def.'s Mot. at 32 n.11.

### i.      NTL-05 Did Not Breach the Lease

NTL-05 was issued by MMS on June 8, 2010, *see* Def.'s Ex. 11, and it was set aside by the district court on October 19, 2010, *Ensco*, 2010 WL 4116892. In setting aside the notice, the district court held that NTL-05 was a substantive rule that should have been issued under the formal process of notice-and-comment rulemaking. Here, plaintiffs assert that the notice dramatically increased their costs of performance, *see* Pls.' Mot. at 55, and also breached the lease by "denying Century its statutory right to participate in the notice and comment procedure," Compl. ¶ 21. Plaintiffs' arguments in this regard are without merit.

NTL-05 imposed a number of information, certification, and inspection requirements that had been recommended for immediate implementation in the Safety Measures Report. *Compare* Def.'s Ex. 6 at A18-A28 *with* Def.'s Ex. 11. Plaintiffs were never ordered to meet those requirements, because they apply only to drilling operations, and plaintiffs have never conducted any drilling operations under their lease, nor have they submitted an application to do so. NTL-05, moreover, was in effect for only four months, and, with the exception of one week in late-October 2010, would not have affected active operations under any lease during that time due to the moratoria. Plaintiffs do not dispute the short duration of NTL-05, nor do they respond to the argument that plaintiffs could not have been affected by its requirements. Instead, plaintiffs point out that the requirements contained in NTL-05 were later incorporated, along with new requirements, into the DSR and thus remain in effect to this day. Because the court has already held that the DSR did not breach plaintiffs' lease, there is no basis for concluding that the less onerous requirements of NTL-05 breached the lease, particularly when those requirements were never applied to plaintiffs.

### ii.      NTL-06 Did Not Breach the Lease

NTL-06 requires plaintiffs to adopt new assumptions in their calculation of the worst-case discharge scenario required under the regulations. Plaintiffs argue that, due to those new assumptions, NTL-06 has breached their lease in two ways. First, plaintiffs contend that they are now required to demonstrate the financial capability to respond to a much higher worst-case discharge volume than before,

and that they are unable to do so.[24]  That change, according to plaintiffs, breaches sections 1 and 2 of their lease.  Second, plaintiffs argue that the higher worst-case discharge volume has increased their bonding requirement in violation of section 8 of their lease.[25]  The court concludes that NTL-06 does not breach any term of the lease.

Under the regulations in effect when plaintiffs executed their lease, lessees were required to include a blowout scenario with their EP.  30 C.F.R. § 250.213(g). In addition, lessees were required to include an OSRP with their EP, or they could refer to a previously approved regional OSRP.  *Id.* § 250.219.  The OSRP, in turn, was required to include the lessee's calculation for worst-case discharge volume. *Id.* §§ 250.219(a)(2)(iv), 254.26(a).  The lessees were instructed to "provide any assumptions made and the supporting calculations used to determine this volume," *id.* § 254.26(a); additionally, the regulations set forth a number of assumptions that had to be made in calculating the worst-case discharge volume, *id.* § 254.47. Under the regulations in effect for EPs, plaintiffs were required to attest that they "have or will have the financial capability to drill a relief well and conduct other emergency well control operations" and they were also required to demonstrate sufficient Oil Spill Financial Responsibility (OSFR), which is often satisfied with a bond.  *See id.* § 250.213(e).

In essence, plaintiffs argue that the regulations set forth a limited number of assumptions that had to be made when calculating the worst-case discharge

---

[24]/  Plaintiffs argue that, before NTL-06, they were required to certify that they had the financial capability to respond to a worst-case discharge volume of 1500 barrels for 30 days; following NTL-06, however, plaintiffs state that they must now certify that they have the financial capability to respond to a worst-case discharge volume of 142,977 barrels for 120 days. Plaintiffs assert that the change in worst-case discharge volume and response time has increased their required financial certification amount from only $4.3 million to more than $1.8 billion. Pls.' Mot. at 33-34.  Those precise dollar figures, however, are based on a ten-day response with a daily volume of 1500 barrels and a 120-day response with a daily volume of 50,000 barrels. *See* Pls.' Ex. 8 at 2.

[25]/  Plaintiffs also argue that NTL-06 is a substantive regulation that should have been issued in accordance with the requirements of notice-and-comment rulemaking.  Pls.' Mot. at 54. That argument is not properly before this court.  If plaintiffs believe that NTL-06 did not meet the procedural requirements of the APA, they are entitled to file a petition for review in district court.  *See* 5 U.S.C. §§ 702, 706(2)(D); *Ensco*, 2010 WL 4116892.

volume, and that NTL-06 added a number of new substantive requirements not contained in the regulations.  That argument, however, mischaracterizes both the nature of the regulations and the effect of the notice.  The OSRP regulations do set forth a number of assumptions and factors to be considered in calculating the worst-case discharge volume, *see id.* § 254.47, and those assumptions are incorporated into the regulations that govern EPs, *see id.* § 250.219, as well as the regulations that govern OSFR, *see id.* § 253.14.

With respect to the information required for an EP, however, the regulations provide that "[o]n a case-by-case basis, the Regional Supervisor may require you to submit additional information if the Regional Supervisor determines that it is necessary to evaluate your proposed plan or document."  *Id.* § 250.201(b).  Similarly, the regulations provide that "[t]he Regional Supervisor may limit the amount of information or analysis that you otherwise must provide in your proposed plan or document under this subpart" when certain requirements are met.  *Id.* § 250.201(c).  In other words, the information required for EPs, including the required blowout scenario, is not a fixed or stagnant set of requirements, as plaintiffs suggest.

In NTL No. 2008-G04, MMS modified the regulatory requirements by reducing the amount of information that operators were required to provide for their EPs and DOCDs.  *See* Def.'s Ex. 15.  Therefore, plaintiffs in this case prepared their EP based not on what the regulations required on their face, but on the more limited information required under NTL No. 2008-G04.  NTL-06, in turn, rescinded NTL No. 2008-G04, and thus required plaintiffs to again provide the information originally mandated under the regulations – regulations that were in effect when the lease was executed and to which the lease has continually, therefore, been subject.  Stipulation No. 8 of the lease also requires plaintiffs to meet the mitigation measures "outlined in the most current MMS Notices to Lessees" issued pursuant to the OCSLA regulations.  *See* Def.'s Ex. 1 at A5.  Plaintiffs acknowledge in their complaint that the effect of NTL-06 was to "rescind[] certain limitations previously put into place by NTL No. 2008-G04."  Compl. ¶ 23.

To the extent that the government requested additional information from plaintiffs via electronic mail or other means, *see* Pls.' Exs. 21, 25-26, such requests were authorized by the regulations in effect when the lease was executed, *see* 30 C.F.R. § 250.201(b), and plaintiffs were required to comply with those requests,

*see id.* § 250.186(a) ("You must submit information and reports as MMS requires.").  In sum, the requirements imposed by both NTL-06 and the e-mail correspondence from the agency were well within the government's authority under the lease; the regulations in effect when the lease was executed; and the lease requirements that subjected operators to the most current NTLs issued pursuant to the implementing regulations.  The calculations currently required for a worst-case discharge scenario are fully consistent with both the lease terms and regulations in effect when the lease was executed.  Thus, where the referenced calculations have now resulted in plaintiffs' inability to demonstrate their financial capability, that inability does not reflect a breach of section 1 or section 2 of plaintiffs' lease.

Likewise, the court holds that NTL-06 did not breach section 8 of the lease, which provides that "[t]he Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary."  Def.'s Ex. 1 at A2.  Plaintiffs argue that the new assumptions and calculations required by NTL-06 increased their required bond from $35 million to $150 million.

The court first notes that section 8 of the lease does not impose a duty on the government; rather, it imposes a duty on the lessees to secure and maintain a bond in the amount required by the regulations in effect on the date of lease execution.  Section 8 further provides that the government may require the lessees to furnish "additional security" if it is deemed to be necessary after the commencement of operations on the site.  In order to demonstrate a breach of section 8 of the lease, plaintiffs must establish that they are now required to furnish a bond that exceeds the bond required under the regulations in effect when the lease was executed.  They have failed to do so.

Before NTL-06 was issued, plaintiffs were required to maintain their bond in accordance with the regulations that were in effect when their lease was executed; after the issuance of NTL-06, plaintiffs have remained under an obligation to maintain their bond in accordance with the regulations in effect when their lease was executed.  Contrary to plaintiffs' assertions, there has been no change in the bonding requirements set forth in the regulations; those requirements, from the outset, have been based on specified worst-case discharge volumes as follows:

| Worst-Case Discharge Volume | Applicable Amount of OSFR |
|---|---|
| More than 1000 barrels but not more than 35,000 barrels | $35,000,000 |
| More than 35,000 barrels but not more than 70,000 barrels | $70,000,000 |
| More than 70,000 barrels but not more than 105,000 barrels | $105,000,000 |
| More than 105,000 barrels | $150,000,000 |

30 C.F.R. § 253.13(b)(1).  Under these regulations, moreover, the government may require an operator to furnish a bond that exceeds what is set forth in the table presented above, based on environmental and other concerns, with an upper limit of $150 million.  *See id.* § 253.13(b)(3).  Neither the table, nor the government's ability to deviate from that table, has changed since plaintiffs executed their lease. *Compare* 30 C.F.R. § 253.13(b)(1), (b)(3) *with* 30 C.F.R. § 553.13(b)(1), (b)(3) (2012).

NTL-06 does not require plaintiffs to furnish a bond that exceeds what was required under the regulations in effect when they signed their lease; instead, what has changed are the underlying factors that determine which category the required bond amount falls under – specifically, plaintiffs' worst-case discharge volume. Because that volume was only 1500 barrels before NTL-06 became effective, plaintiffs fell within the category requiring only a $35 million bond under the regulations.  NTL-06 changed the calculation of worst-case discharge volume, and had the effect of increasing that volume to 142,977 barrels for plaintiffs' proposed operations under their lease.  Under the regulations in effect when plaintiffs signed their lease – and under the regulations in effect today – a worst-case discharge volume of that magnitude places plaintiffs in the highest category and requires them to furnish a bond in the amount of $150 million.  The court has already held that the changes in the calculation of worst-case discharge volume effected through NTL-06 did not breach plaintiffs' lease.  Similarly, the fact that the new calculations raised plaintiffs' discharge volumes and consequently elevated plaintiffs' bond requirement to a higher category does not reflect a breach of section 8 of the lease by defendant.

Plaintiffs are correct that the government may not, consistent with section 8,

34

require them to furnish a bond that exceeds what the regulations required when the lease was signed until after operations have commenced. In this case, however, the government has never required plaintiffs to furnish a bond that exceeds what the regulations have always required. In any event, even if the court has misread the language of section 8, and NTL-06 has in fact breached section 8 of the lease, the government is nonetheless protected from liability for such a breach under the sovereign acts doctrine, as discussed more fully *infra*.

### iii.    NTL-10 Did Not Breach the Lease

Plaintiffs argue that NTL-10 breached their lease by imposing substantial new costs on their performance. NTL-10 does set forth two new requirements, but neither of them breaches plaintiffs' lease. First, the notice requires operators to certify, through an "authorized company official," that its activities will comply with applicable regulations, including the new regulations that were issued in 2010. Def.'s Ex. 26 at A501-A502. The court has already held that those regulations did not breach plaintiffs' lease, so plaintiffs fail to establish why requiring an operator to certify its compliance with them, and with other pre-existing regulations, would do so.

NTL-10 also informs operators that "BOEMRE will evaluate whether each operator has submitted adequate information demonstrating that it has access to and can deploy surface and subsea containment resources that would be adequate to promptly respond to a blowout or other loss of well control." Def.'s Ex. 26 at A502. The regulations that were in effect when plaintiffs signed their lease, and that remain in effect today, require plaintiffs to demonstrate that they have both the financial capability to respond to a worst-case discharge scenario and access to the equipment needed to do so. *See* 30 C.F.R. §§ 250.213(e), 254.23-254.26; *see also* 30 C.F.R. §§ 550.213(e) (2012). The regulations also provide that "[i]n addition to the requirements listed in this part, [operators] must provide any other information the Regional Supervisor requires for compliance with appropriate laws and regulations." 30 C.F.R. § 254.5(d). NTL-10 does not breach plaintiffs' lease.

### d.    The Categorical Exclusions Memorandum Did Not Breach the Lease

Plaintiffs assert that the memorandum issued by the Director of BOEMRE on August 16, 2010 breached their lease. That memorandum stated that the agency

would review its use of categorical exclusions for certain plans and documents, and that those plans and documents would not be categorically excluded from NEPA during the pendency of the agency's review. *See* Def.'s Ex. 21. Plaintiffs assert that this change has increased the costs of their performance under the lease, *see* Pls.' Mot. at 56, and has therefore breached the lease. Plaintiffs are incorrect.

Plaintiffs' lease is subject to NEPA and its implementing regulations, at least those regulations that were in effect when the lease was executed. Under NEPA, agencies may exempt certain categories of activities from environmental review when they "do not individually or cumulatively have a significant effect on the human environment and have been found to have no such effect in procedures adopted by a Federal agency." 40 C.F.R. § 1508.4. The categorical exclusion of activities from environmental review was and is within the discretion of individual agencies; nothing in plaintiffs' lease can be read to provide static treatment for their activities in perpetuity. In fact, the regulations then in effect expressly state that the government would perform the environmental reviews and documentation required by NEPA in reviewing EPs. *See* 30 C.F.R. § 250.232(c). The categorical exclusions memorandum did not breach any term of plaintiffs' lease.

## 2.   This Court May Not Hear Plaintiffs' Challenges to the Substantive Validity of the Government's Actions

In their motion, plaintiffs argue that this court is empowered to review the government's actions in this case under the standard of judicial review set forth in section 706 of the APA. By its own terms, the lease is subject to statutes that were in existence on the effective date of the lease. Plaintiffs therefore argue that the substantive standard of review described in the APA is, in effect, a term of the lease, which was breached when the government imposed requirements on lessees that were, according to plaintiffs, arbitrary and capricious. As discussed above, section 1 of plaintiffs' lease states that

> [t]his lease is issued pursuant to the Outer Continental
> Shelf Lands Act of August 7, 1953, 67 Stat. 462;
> 43 U.S.C. § 1331 et seq., as amended (92 Stat. 629),
> (hereinafter called the "Act"). The lease is issued subject
> to the Act; all regulations issued pursuant to the Act and
> in existence upon the Effective Date of this lease; all
> regulations issued pursuant to the statute in the future

> which provide for the prevention of waste and
> conservation of the natural resources of the Outer
> Continental Shelf and the protection of correlative rights
> therein; and all other applicable statutes and regulations.

Def.'s Ex. 1 at A1.  Plaintiffs argue that the term "other applicable statutes," as used in section 1, must be interpreted to include the APA.  The court disagrees because that term of the lease applies only to "applicable statutes," and the court concludes that the APA is not applicable.

There is no question that this court is without subject matter jurisdiction over claims under the APA.  *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (affirming that this court "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act"); *Murphy*, 993 F.2d at 874 (Fed. Cir. 1993) ("[T]he Claims Court has no authority to invoke the APA.").

Interior cannot, through its standard lease forms, somehow endow this court with jurisdiction over claims challenging government action under the APA; Congress has vested subject matter jurisdiction over such claims in other fora.  *Cf. Belk v. United States*, 858 F.2d 706, 711 (Fed. Cir. 1988) (Bennett, J. concurring) ("Further, the parties cannot by their consent confer jurisdiction on a court."). To the extent that plaintiffs seek to challenge the reasonableness or substantive validity of the government's actions, they have an available remedy in the district courts.  *See Bowen v. Massachusetts*, 487 U.S. 879, 891 n.16 (1988) (noting that federal district courts may review agency action under the APA pursuant to their federal question jurisdiction); *Russell v. United States*, 78 Fed. Cl. 281, 288 (2007) (noting that "the APA confers jurisdiction for judicial review of final agency decisions on the United States district court and not the Court of Federal Claims"); *McNabb v. United States*, 54 Fed. Cl. 759, 767 (2002) (holding that "APA reviews are conducted in federal district court rather than the Court of Federal Claims").  Because this court has no jurisdiction to hear plaintiffs' claims challenging the substantive validity or reasonableness of the government's actions, the APA cannot

be construed as an "applicable statute" under section 1 of the lease.[26]

### 3.    The Government Did Not Breach Its Implied Duty of Good Faith and Fair Dealing

Plaintiffs further argue that the government has breached the implied duty of good faith and fair dealing by dramatically increasing their costs of performance under the lease.  In plaintiffs' view, even if the APA is not incorporated as an express term of the lease under section 1, an implied duty imposes the exact same standard of conduct on the government.  In other words, when the government acts in a manner that is arbitrary or capricious, it necessarily breaches the implied duty of good faith and fair dealing, according to plaintiffs, even if such conduct does not breach any express term of the lease.  Defendant, in contrast, argues that the duty must be tethered to an express term of the lease and cannot create new obligations that do not appear on the face of the lease.  On that point, defendant is correct.

The covenant of good faith and fair dealing is implied in every contract and imposes certain obligations on the contracting parties, including a duty not to "interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *see also* Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

In *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir.

_____

[26]/ The court notes that certain statutes are clearly "applicable" in that they are part of the comprehensive scheme that governs offshore exploration and development, and many of those statutes are in fact expressly referenced in the lease, in the statute, or in the regulations.  *See, e.g.*, Def.'s Ex. 1 at A5 (the Endangered Species Act and the Marine Mammal Protection Act); 43 U.S.C. § 1351(d) (CZMA); *id.* § 1351(e) (NEPA).  In contrast, the Federal Circuit has refused to read general contract terms as incorporating specific rights under the APA and other statutes. *See, e.g.*, *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1431-33 (Fed. Cir. 1997) (rejecting the plaintiffs' argument that a provision in a housing assistance payment contract, which made the parties subject to "all applicable regulations," incorporated the rulemaking procedures of the APA, 5 U.S.C. §§ 551, 553 (2006), or the disclosure requirements of the Freedom of Information Act, 5 U.S.C. § 552 (2006)).  Plaintiffs' expansive reading of section 1 would incorporate the entire United States Code as a term of the lease.

2010), the plaintiff in that case argued that the government breached the implied duty of good faith and fair dealing when it suspended timber harvesting activities under a number of contracts.  The court first explained that the government breaches the implied duty "when the subsequent government action is specifically designed to re-appropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Id.* at 829.  In that case, however, the court concluded that the government had not breached the implied duty because there was no evidence that the challenged suspensions "were undertaken for the purpose of delaying or hampering [the] contracts."  *Id.* at 830.

The court in *Precision Pine* explained that "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *Id.* at 831.  In that case, the court noted that the plaintiff had acquired the right to harvest timber, but also explained that the right was expressly qualified by a contract clause under which the plaintiff agreed to interrupt or delay activities under the contract in order to prevent environmental degradation or to comply with a court order.  Because the challenged suspension was expressly contemplated under the terms of the contract, the court held that it did not result in a breach of the implied duty of good faith and fair dealing.

In *Scott Timber Co. v. United States*, 692 F.3d 1365 (Fed. Cir. 2012), the Federal Circuit applied the same legal standard in similar factual circumstances.  Following its earlier decision in *Precision Pine*, the court held that there was no breach of the implied duty of good faith and fair dealing when the government suspended timber harvesting contracts for what the plaintiff asserted was an unreasonable period of time.  The court held that there was no evidence that the government had targeted the suspended contracts for the purpose of preventing performance by the plaintiff or to re-appropriate any benefit under the contract.[27] *Id.* at 1374-75.

Here, likewise, there is no evidence that the government's actions targeted plaintiffs' lease for the purpose of re-appropriating any of plaintiffs' benefits under

---

[27]/  There is substantial overlap between the Federal Circuit's approach to the implied duty of good faith and fair dealing, and the "public and general" inquiry required under the sovereign acts doctrine, discussed *infra*.

the lease.  Plaintiffs argue that their claim is tethered to section 2 of the lease, which grants them the "exclusive right and privilege to drill for, develop, and produce the oil and gas resources" on the leased area.  Pls.' Mot. at 73-74.  Much like the contract rights at issue in *Precision Pine*, however, plaintiffs' rights under their lease are limited by its express terms, as well as the statutory and regulatory requirements incorporated by reference.  Because the government's actions were authorized under the lease and applicable law, they cannot breach the implied duty of good faith and fair dealing.  *See Precision Pine*, 596 F.3d at 830; *see also* 13 Richard A. Lord, *Williston on Contracts* § 63:22 (2000) ("As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.").

Plaintiffs assert that the implied duty has been breached because the actions taken by the government have dramatically increased plaintiffs' costs.  However, there is no express term in the lease that immunizes them from future increases in their costs of performance.  *See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998) (noting that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated in the contract").

Finally, the record indicates that the government has acted in good faith, granting plaintiffs an extension of their lease to afford them additional time to comply with the new regulatory requirements and to account for any time lost due to the moratoria on permitting and other activities.  The lease extension further undermines plaintiffs' assertion that the government targeted their contracts for the purpose of preventing performance or to re-appropriate a benefit for itself.[28]  *Cf. Conner Bros. Constr. Co. v. United States*, 550 F.3d 1368, 1378 (Fed. Cir. 2008)

---

[28]/ Plaintiffs argue that the extension granted to them is not evidence of the government's good faith because such an extension was required under OCSLA.  *See, e.g.*, Pls.' Mot. at 66.  However, the section of OCSLA referenced by plaintiffs does not require the Secretary to grant extensions to any particular lessee; rather, it simply requires the Secretary to promulgate regulations providing for such extensions.  *See* 43 U.S.C. § 1334(a)(1) (stating that the "regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions . . . for the extension of any such permit or lease affected by suspension . . . by a period equivalent to the period of such suspension . . ., except that no permit or lease shall be so extended when such suspension . . . is the result of gross negligence or willful violation of such lease or permit, or of regulations issued with respect to such lease or permit").

("The Corps of Engineers did not seek to shift its costs to [the plaintiff], and it granted [the plaintiff] contract extensions to compensate for the period in which [the plaintiff] was shut down.").

> ### C.     Even if the Court Were to Hold that the Government Breached Plaintiffs' Lease, It Would Be Shielded from Liability under the Sovereign Acts Doctrine

The government argues that even if its actions breached the lease, it is still immune from liability under the sovereign acts doctrine. In that regard, defendant contends that the reforms adopted in the wake of the Deepwater Horizon disaster were public and general in nature, and that those sovereign actions rendered its contractual performance under the original lease impossible. Plaintiffs, in contrast, argue that the doctrine does not apply in this case because the government's actions were not public and general, but were instead nothing more than an effort to escape its contractual obligations. The court agrees with defendant.

### 1.     Applicable Law

The sovereign acts doctrine is a variation of the common law doctrine of impossibility, adapted for the unique circumstances faced by the government as a contractor. Under the impossibility doctrine, also known as the impracticability doctrine,

> [w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption upon which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261. The impossibility doctrine applies to, *inter alia*, statutory, regulatory, or other legal changes that render performance by one of the contracting parties impracticable:

> If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order

41

> is an event the non-occurrence of which was a basic
> assumption on which the contract was made.

*Id.* § 264; *see Hicks v. United States*, 89 Fed. Cl. 243, 258 (2009) (noting that the
the doctrine may be applied when performance by one of the parties is rendered
impracticable because of an intervening government order).

In general, the impossibility defense is not available when the barrier to
performance was created by the party seeking to invoke the defense. *See*
Restatement (Second) of Contracts § 261 (limiting a contractor's use of the defense
to impracticability caused by the occurrence of an event "without his fault"); *id.*
§ 261, comment d ("If the event is due to the fault of the obligor himself, this
Section does not apply."). The sovereign acts doctrine was established in the early
years of the Court of Claims, *see Wilson v. United States*, 11 Ct. Cl. 513 (1875);
*Jones v. United States*, 1 Ct. Cl. 383 (1865); *Deming v. United States*, 1 Ct. Cl. 190
(1865), and addresses situations in which the government's acts as a sovereign
render the performance of its duties as a contractor impracticable. In such cases,
"[t]he two characters which the government possesses as a contractor and as a
sovereign cannot be thus fused; nor can the United States while sued in the one
character be made liable in damages for their acts done in the other." *Jones*, 1 Ct.
Cl. at 384.

In those early cases, the court emphasized that the sovereign acts doctrine
did not afford any special treatment for the government. Rather, its purpose was to
ensure that the government as contractor was treated the same as any private
contractor whose performance was rendered impracticable by an intervening act of
the government. *See id.* ("In this court the United States appear simply as
contractors; and they are to be held liable only within the same limits that any other
defendant would be in any other court."); *Deming*, 1 Ct. Cl. at 191 ("In this court
the United States can be held to no greater liability than other contractors in other
courts.").

In order to ensure that the government was afforded the same treatment as a
private contractor, the court held that it was necessary to draw a sharp distinction
between the government-as-sovereign and the government-as-contractor, and that
the distinction between the two would be maintained as long as the sovereign acts
that rendered performance impracticable were "public and general." *See Jones*,
1 Ct. Cl. at 384 ("Whatever acts the government may do, be they legislative or

executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons."); *see also Wilson*, 11 Ct. Cl. at 521 ("This double character of the Government cannot be lost sight of in any of its transactions."); *Deming*, 1 Ct. Cl. at 191 ("The United States as a contractor are not responsible for the United States as a lawgiver.").

The doctrine was later adopted by the Supreme Court of the United States, *see Horowitz v. United States*, 267 U.S. 458, 461 (1925) ("It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign."), and it has been applied in a number of cases by this court and the Federal Circuit.  In the leading case on the doctrine, the Supreme Court explained that

> [t]he sovereign acts doctrine thus balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor.  If the answer is no, the Government's defense to liability depends on the answer to the further question, whether that act would otherwise release the Government from liability under ordinary principles of contract law.

*United States v. Winstar Corp.*, 518 U.S. 839, 896 (1996).

In subsequent years, the Federal Circuit has followed the general approach set forth by the Court of Claims in its earliest cases on the sovereign acts doctrine.  First, that court has explained that the government-as-sovereign must be separated from the government-as-contractor, and that the latter must be treated in the same manner as any private contractor:

> The basic notion of the sovereign acts doctrine is that the United States as a contracting party acts in a different capacity from its role as a sovereign.  As a contractor, it stands in the same shoes as any private party would in dealing with another private party; as a sovereign, it

43

> stands apart.  The acts of one are not to be 'fused' with
> the other – if an act of the Government as sovereign
> would justify non-performance by any other defendant
> being sued for contract breach, then the Government as
> contractor is equally free from liability for non-
> performance.

*Stockton East*, 583 F.3d at 1366.

Further, when the government's actions render performance impracticable, those actions will be viewed as sovereign acts only if they are public and general, while any interference with the government's contracts must be only incidental. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 520 (Fed. Cir. 2011) ("The government is not liable for breach of contract whenever it takes any generally applicable action in its sovereign capacity that incidentally frustrates performance of a contract to which it is a party."); *see also Winstar*, 518 U.S. at 896 (noting that "governmental action will not be held against the Government for purposes of the impossibility defense so long as the action's impact upon public contracts is, as in *Horowitz*, merely incidental to the accomplishment of a broader governmental objective").

In contrast, the sovereign acts defense never applies when the government's actions were designed to target its contractual obligations or when those actions have the substantial effect of releasing it from its obligations.  *See Winstar*, 518 U.S. at 899 (explaining that a government action is not public and general when "it has the substantial effect of releasing the Government from its contractual obligations"); *Stockton East*, 583 F.3d at 1366 (noting that the relevant question is whether the "act [is] simply one designed to relieve the Government of its contract duties, or is it a genuinely public and general act that only incidentally falls upon the contract?"); *Conner Bros.*, 550 F.3d at 1374 ("[T]he sovereign acts defense is unavailable where the governmental action is specifically directed at nullifying contract rights."); *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997) ("The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties.").

Finally, even if the government demonstrates that its actions were sovereign

in nature, it must still prove that those actions rendered its performance impossible. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1287 (Fed. Cir. 2008) ("[P]erformance by the government is excused under the sovereign acts defense only when the sovereign act renders the government's performance impossible."). However, the Federal Circuit "and its predecessor have long recognized that the doctrine of impossibility does not require a showing of actual or literal impossibility of performance but only a showing of commercial impracticability." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002). For the reasons noted below, the court concludes that the actions challenged here were sovereign in nature – *i.e.*, they were public and general – and rendered the government's performance under the lease not only impracticable, but legally impossible.

### 2.    The Government's Response to the Deepwater Horizon Disaster Was a Sovereign Act

The government asserts that the actions challenged by plaintiffs in this case were designed to achieve important public purposes, such as drilling safety and environmental protection, and were not an attempt to relieve the government of its contractual obligations. Plaintiffs disagree, arguing that the government's actions fail to meet the first prong of the sovereign acts defense for two different reasons. First, plaintiffs argue that the government has not established that its response to the Deepwater Horizon disaster was truly motivated by its ostensible objectives. Rather, according to plaintiffs, it is possible that the government may have used the disaster as a mere pretext for escaping its duties under the lease. Second, plaintiffs argue that the government's actions were not public and general because they did not directly affect anyone other than OCS lessees.

The Supreme Court and the Federal Circuit have identified a number of questions that are relevant to a court's determination of whether a sovereign act is public and general in nature. First, was the government action designed for the specific purpose of abrogating its contractual obligations? This inquiry focuses on the government's intent. Second, was the primary consequence of the government action to release the government from its contracts or otherwise confer some material benefit on the government as a contractor? This inquiry focuses on the effects of the government's action. Finally, was the government action targeted solely at its contracting partners or did it have a broader impact? This inquiry focuses on the distribution or scope of the government's action. For the reasons

45

discussed below, the court holds that each of these factors leads to the conclusion that the government was acting in its sovereign capacity when it adopted the regulatory reforms now challenged by plaintiffs.

> ### a.   The Government Did Not Engage in the Challenged Actions for the Purpose of Escaping Its Obligations

Plaintiffs assert that the moratoria, the new regulations, and the guidance issued through NTLs were not really intended to ensure human safety, protect the environment, or conserve the natural resources of the OCS.  Instead, according to plaintiffs, the disaster merely provided a convenient excuse for the government to disregard its obligations under the lease.  *See* Pls.' Mot. at 2 (asserting that there "are disputed issues of material fact regarding the promulgation and scope of the rules and regulations and the Government's bad faith and unfair dealing"); 63 (asserting that "the precise purpose of the reform efforts" was to release the government from its contractual obligations); Pls.' Reply at 17 ("Plaintiffs dispute the Government's unsubstantiated conclusions that its actions and inactions following Deepwater Horizon were 'for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein' within the contemplation of Section 1 of the Lease, or were 'public and general' for purposes of the sovereign acts and unmistakability doctrines.").

The Federal Circuit has held that actions carried out with the *purpose* of relieving the government-as-contractor of its duties are not sovereign in nature. *See Conner Bros.*, 550 F.3d at 1374 ("[W]hen considering whether the alleged sovereign act is exclusively directed to aborting performance of government contracts, courts addressing the sovereign acts doctrine have looked to the extent to which the governmental action was directed to relieving the government of its contractual obligations.").  Plaintiffs argue, in effect, that the government's actions in this case were designed with the purpose of escaping its contractual obligations.

In *Yankee Atomic*, 112 F.3d at 1569, the government entered into contracts with a number of nuclear utilities, under which it agreed to provide uranium enrichment services to those utilities at fixed prices.  Many years later, the government discovered that decontaminating and decommissioning the facilities used to enrich uranium under its earlier contracts might exceed $20 billion over forty years.  In order to cover those unexpected costs, Congress imposed a special

assessment on all domestic utilities that had purchased uranium enrichment services in the past, whether those services were purchased directly from the government or from another party on the secondary market. The plaintiff in that case argued that the special assessments breached its earlier contract with the government for uranium enrichment services by retroactively increasing the price of those services.

The Federal Circuit rejected that argument and held that the government was protected from liability under the sovereign acts doctrine. The court focused on the purpose of the governmental action – *i.e.*, on whether the legislation imposing the special assessment was enacted for the benefit of the government-as-contractor or for the benefit of the public. The court concluded that "Congress's main purpose was to spread the costs of a problem that it realized only after the contracts had been performed." *Id.* at 1575-76. In addition, the Federal Circuit distinguished the Supreme Court's earlier decisions in *Lynch v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935), explaining that those cases "involved situations where the congressional act made clear that its purpose was, at least in part, to abrogate past public contracts." *Yankee Atomic*, 112 F.3d at 1577. In short, what the Federal Circuit found most important was whether the action asserted by the government to be a sovereign act was designed to benefit the government-as-contractor or the public. *See id.* at 1575 ("Thus, it is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental actions.").

Similarly, in *Conner Bros.*, 550 F.3d at 1368, the Federal Circuit held that the government's actions were not motivated by an intent to benefit the government as a contractor, but were instead based on important and unrelated national security concerns. There, the plaintiff was constructing a headquarters facility for the Army Rangers at Fort Benning, Georgia, but was temporarily denied access to the construction site following the events of September 11, 2001. The Federal Circuit denied the contractor's claim for delay damages and held that the government was protected from liability under the sovereign acts doctrine. In reaching that decision, the court emphasized that the purpose of the exclusion order was to maintain security, not to relieve the government of its contractual obligations:

> The Army did not exclude [the contractor] from the

> worksite because it was unhappy with [its] performance,
> or because it was unhappy with the contract price, or
> because it decided that it no longer wanted a new Ranger
> headquarter facility. Rather, [the commander] made a
> determination that excluding [the contractor] directly
> served the government's broader objective of restricting
> access to the compound in order to minimize potential
> threats to operational security and to facilitate
> deployment.

550 F.3d at 1377.

Here, plaintiffs' argument simply strains credulity. The record compiled by the parties in this case is replete with contemporaneous documents discussing the impacts of the Deepwater Horizon disaster, and explaining how the augmented regulatory regime would reduce the risk of such a catastrophic event in the future. The court concludes that there is no genuine issue of material fact as to whether the purposes of the government's reform efforts were to ensure human safety, protect the environment, and conserve the natural resources of the OCS.[29]

### b.    The Government Gained No Material Benefit by Virtue of the Challenged Actions

In addition to examining the purpose of the government's actions, courts have reviewed whether those actions would inure to the benefit of the government in its role as a contractor. *See Conner Bros.*, 550 F.3d at 1378 (finding it relevant that the "government gained no economic advantage" in exercising its sovereign powers); *see also Winstar*, 518 U.S. at 896 (noting that the sovereign acts doctrine is inapplicable to governmental actions tainted by an object of "self-interest" or "self-relief"). Here, there is no evidence that the government will derive any economic or other material benefit by virtue of its actions in the wake of the Deepwater Horizon disaster. Rather, it appears that those actions might actually impose significant economic costs and administrative burdens on the government.

---

[29]/ In contrast, there is a genuine dispute between the parties with respect to whether the government's specific responses to the disaster were reasonable, but, for the reasons discussed above, that issue is not properly before the court in this case.

First, the government states that the administrative burden of implementing its new regulatory requirements will be substantially greater than the burden of administering leases under the earlier regulatory regime.  Plaintiffs do not dispute that assertion.  Given the amount of new information required from operators, which plaintiffs argue will impose a nearly insurmountable burden upon them, the government's predictions of increased burdens of its own appear to be well-founded.

Further, to the extent that the new regulatory requirements delay or foreclose exploration and production activities under existing leases, as plaintiffs predict they will, the government stands to incur substantial economic losses due to unrealized royalties.  In this case, neither the purpose nor the consequence of the government's actions is to release the government from its contractual obligations or to confer an economic or other material benefit upon the government.  Thus, the substantial effect of the regulatory reforms challenged by plaintiffs supports the government's assertion of the sovereign acts doctrine.

Plaintiffs fare no better in their contention that this is a "change of heart" case, asserting that "in response to Deepwater Horizon, the Government lowered its acceptable level of risk and imposed new conditions on its obligations to allow drilling – mandatory conditions commensurate with its new, lower tolerance for risk."  Pls.' Mot. at 66.  Plaintiffs' argument is based on the faulty assumption that it was the government, rather than plaintiffs, who agreed to bear the costs of responding to a catastrophic blowout or other similar event under the lease.  Section 14 of the lease states that "[t]he Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons resulting from any operation on the leased area conducted by or on behalf of the Lessee."  Def.'s Ex. 1 at A6.  In addition, the regulations in effect when the lease was executed state that the lessee or operator "must immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard."  30 C.F.R. § 250.107(b); *see generally id.* pt. 253 (requiring lessees to demonstrate sufficient OSFR); *id.* pt. 254 (requiring lessees to submit an OSRP).  The challenged reforms do not protect the government from exposure to risks it assumed under the lease.  Rather, they ensure that the parties contractually responsible for responding to blowouts and spills – lessees and operators – are actually able to meet their responsibilities.

### c.  The Impact of the Government's Actions Are Broad and Are Not Limited to the OCS Lessees

In plaintiffs' view, the government's actions in this case are not protected by the sovereign acts doctrine, regardless of whether they serve an important public purpose, because they are targeted exclusively at OCS lessees.  The Federal Circuit has explained that "[a]nother factor relevant to the 'public and general' inquiry is whether the governmental action applies exclusively to the contractor or more broadly to include other parties not in a contractual relationship with the government."  *Conner Bros.*, 550 F.3d at 1375.  In this case, it is clear that the government's actions will have impacts on parties other than the OCS lessees.  Further, those actions are clearly designed to prevent another catastrophic oil spill – an event that, like the Deepwater Horizon disaster, would have immeasurable impacts on parties other than the lessees.

Plaintiffs assert that the environmental and safety risks the new regulations and requirements are designed to address were created by contract and exist only because the government has decided to allow exploration and production on the OCS pursuant to those contracts.  Further, plaintiffs note that many of the new requirements were issued as NTLs, which by definition apply only to OCS lessees.  The fact that subcontractors and service providers may be impacted by the regulations is irrelevant, plaintiffs argue, because the only parties directly affected by the new requirements are lessees.

First, as defendant notes, the Federal Circuit has applied the sovereign acts doctrine to government actions that directly affected only its contracting partners and addressed risks that were created by the existence of the affected contracts. In *Klamath*, 635 F.3d at 505, and *Casitas*, 543 F.3d at 1276, for example, the Federal Circuit held that the government's actions in those cases were sovereign, even though the water reductions affected only the plaintiff water districts and addressed environmental risks that were created by the reclamation projects.

The government argues that a sovereign act is public and general when it impacts parties that are not in contractual privity with the government.  Plaintiffs, in contrast, argue that such an act is public and general only when it affects parties that have absolutely no connection to the contracts.  The government's position is consistent with case law from this court and the Federal Circuit.  In *Yankee Atomic*, 112 F.3d at 1575-76, for example, the Federal Circuit explained that the special

assessments in that case were imposed not only on the government's contracting partners, but also on nuclear utilities that purchased uranium enrichment services on the secondary market. While those utilities were not parties to the contracts, they were certainly connected to them because they purchased enrichment services from parties who had purchased those services directly from the government.

Plaintiffs are incorrect in their assertion that NTLs are addressed to lessees alone. While those documents are referred to as "NTLs," each NTL clearly states that it is a "Notice to Lessees and Operators." *See, e.g.*, Def.'s Ex. 8 at A253. Further, not all OCS lessees are operators, nor are all operators OCS lessees. *See* 30 C.F.R. § 250.150 (defining an operator as the party the lessees have designated as having control over the leased area, and noting that "[a]n operator may be a lessee, the MMS-approved designated agent of the lessee(s), or the holder of operating rights under an MMS-approved operating rights assignment"). Many of the requirements set forth in the NTLs challenged by plaintiffs are directed at operators rather than lessees. *See, e.g.*, Def.'s Ex. 26 (stating that BOEMRE will evaluate whether *operators* have adequately demonstrated their access to sufficient containment resources in their OSRP) (emphasis added).

In addition, while the NTLs are sent to OCS lessees and operators, those notices and the regulations challenged by plaintiffs have impacts on parties other than lessees and operators, and the new requirements they contain are designed to reduce the risk of blowouts and other events that could threaten the entire Gulf region. It is instructive to note that the plaintiffs in *Hornbeck* and *Ensco*, two cases upon which plaintiffs rely heavily in this case, were not OCS lessees; they were service providers involved in the offshore industry in the Gulf of Mexico.

### 3. The Government's Sovereign Acts Rendered Performance by the Government Impossible

In addition to proving that its actions were public and general in nature, the government must also prove that those actions rendered its performance under the lease impracticable. In this case, the impracticability of the performance is plain: the government cannot allow plaintiffs to proceed under the old regulatory regime without violating the law. Plaintiffs do not contend that the government may allow them to explore and develop the leased area in accordance with the requirements that were in effect when the lease was originally executed. Instead, plaintiffs argue that the government has failed to demonstrate impracticability in this case because

the lease allocates the risk of unforeseeable regulatory changes to the government. In short, plaintiffs assert that the government cannot demonstrate impracticability because it breached the lease. Plaintiffs' argument fails for two reasons.

First, the sovereign acts doctrine is an affirmative defense, and it applies only when there has been a breach of contract. *See Conner Bros.*, 550 F.3d at 1371 ("The doctrine is an affirmative defense that is an inherent part of every government contract."); *see also Stockton East*, 583 F.3d at 1360 ("Once the Government's breach of contract has been established, the Government is liable for the breach and ensuing damages, unless it can prove an affirmative defense of some kind that absolves it from that liability."). For that reason, the existence of a breach does not preclude the applicability of the sovereign acts doctrine; indeed, the existence of a breach is a prerequisite to its applicability.[30]

Further, plaintiffs' argument is in direct conflict with the central holding in this case: that *plaintiffs* assumed the risk of future regulations under the lease. Because the court has already held that the lease allocates the risk of such changes to plaintiffs, it cannot accept a contrary argument that the lease allocates the risk of those changes to the government for purposes of the sovereign acts doctrine. The government has demonstrated that if the sovereign acts doctrine applies here, the reform efforts implemented in the summer and fall of 2010 have rendered its performance under the earlier regulatory regime – *i.e.*, by allowing plaintiffs to perform under the old rules – legally impossible. *See* Restatement (Second) of Contracts § 264, comment a ("The fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge.").

## CONCLUSION

The court concludes that the actions undertaken by defendant in the wake of the Deepwater Horizon disaster did not breach any term of plaintiffs' lease. In the

---

[30]/ The court has already held that none of the government's actions in this case breached plaintiffs' lease, and the court's discussion of the sovereign acts doctrine necessarily assumes – in contrast to the court's holding on the issue of breach – that the government had breached the lease. The court's two holdings in this case – *i.e.*, that the government did not breach the lease, and that the government is protected from liability under the sovereign acts doctrine – are thus alternative, rather than complementary.

alternative, even if the court were to hold that the government breached plaintiffs' lease, defendant would be shielded from liability under the sovereign acts doctrine. For these reasons, defendant's motion for partial summary judgment on plaintiffs' breach claim is granted, and plaintiffs' cross-motion for partial summary judgment on the same breach claim is denied.  The court thus directs the parties to confer for the purpose of proposing the most appropriate means for expeditiously resolving plaintiffs' remaining claims.[31]

Accordingly, it is hereby **ORDERED** that

(1)    Defendant's Motion for Partial Summary Judgment, filed July 13, 2012, is **GRANTED**;

(2)    Plaintiffs' Cross Motion for Partial Summary Judgment, filed September 10, 2012, is **DENIED**;

(3)    Pursuant to RCFC 54(b), insofar as there is no just reason for delay,[32] the Clerk's Office is directed to **ENTER** judgment for defendant as to Count I of the complaints of both Century and Champion, and to **DISMISS** that count, with prejudice;

(4)    The parties are directed to **CONFER** to determine how they wish to proceed with respect to the remaining claims (Count II and Count III);

---

[31]/  The court notes that Century's complaint set forth three counts:  the breach claim (Count I), the takings claim (Count II), and an unspecified claim (Count III), which purports to include "any and all other causes of action that the actions and inactions of the United States give rise to, including those as described in this Complaint."  Compl. ¶ 63.  In the two years since Century filed its complaint in this court, plaintiffs have made no attempt to further develop or explain the content or jurisdictional basis of the third count of that complaint.

[32]/  In Count II of their complaints, plaintiffs argue that the government has effected an uncompensated taking of their contract rights.  Because this court's disposition of Count I of the complaint will be critically important to its consideration of Count II, the court believes that a final resolution of plaintiffs' breach claim will promote judicial economy and conserve the parties' resources.  For that reason, the court has ordered the entry of judgment on Count I pursuant to RCFC 54(b) to afford plaintiffs the opportunity to seek immediate review of this court's decision in the Federal Circuit in the event they determine an appeal is warranted.

(5)     On or before **March 19, 2013**, the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary blacked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(6)     The parties shall **FILE** a **Joint Status Report** by **March 29, 2013**, proposing the next steps in this litigation.

/s/Lynn J. Bush
LYNN J. BUSH
Judge